IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 10, 2017 Session

## MAURICE JOHNSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Bradley County**
**No. 12-CR-554     Don R. Ash, Senior Judge**

_____

### No. E2017-00037-CCA-R3-PC

_____

Maurice Johnson ("the Petitioner") appeals the Bradley County Criminal Court's denial of post-conviction relief from his convictions of three counts of first degree felony murder, for which he was sentenced to life without parole. On appeal, the Petitioner contends that he was denied the effective assistance of counsel based on trial counsel's failure to: (1) adequately investigate potential witnesses; (2) adequately investigate two witnesses who testified at trial; (3) prepare the Petitioner for testimony; (4) object to irrelevant and prejudicial evidence relating to the Petitioner's drug dealing and "the Sweetwater fight"; (5) question co-defendant Twanna Blair about her statement to police that the perpetrators were white men; and (6) adequately protect the Petitioner's appellate rights. The Petitioner asserts that he is entitled to relief based on these claims individually and based on the cumulative effect of these errors. The Petitioner additionally asserts that the post-conviction court erred by denying relief "in the face of structural error." Following a thorough review, we affirm the judgment of the post-conviction court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Joshua Hendrick, Knoxville, Tennessee, for the appellant, Maurice Johnson.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Counsel; Stephen D. Crump, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual and Procedural Background

*Trial*

This case arises from the 1999 shooting deaths of Orienthal James ("OJ") Blair, Cayci Higgins, and Dawn Rogers in Cleveland, Tennessee. *State v. Maurice Johnson*, No. E2010-01142-CCA-R3-CD, 2011 WL 3586557, at *1 (Tenn. Crim. App. Aug. 16, 2011), *perm. app. denied* (Tenn. Dec. 14, 2011).[1] Following an investigation spanning nine years, the Petitioner and two co-defendants, Michael Younger and Twanna "Tart" Blair, were indicted for conspiracy to commit especially aggravated robbery, especially aggravated robbery, and three counts of first degree felony murder.[2] *Id.* The co-defendants' cases were severed, and the State filed a notice of its intention to seek the death penalty as to the Petitioner. *Id.* The Petitioner proceeded to trial first, in August 2009, with the Honorable Amy Reedy, former Judge of the Criminal Court for the Tenth Judicial District, presiding at trial.[3] *Id.*

On direct appeal, this court summarized the facts presented at trial as follows:

> On the morning of February 14, 1999, Twanna Blair placed a call to Bradley County 911, informing them that she had been shot and that three other people had been killed. Officers responded to the scene, a townhouse in Cleveland, and discovered three victims lying on the living room floor. Emergency personnel rendered aid to Twanna Blair, who was found in the upstairs of the townhouse. The three victims were all deceased as a result of gunshot wounds to the head and/or neck.
>
> Eric Hampton was a detective with the Cleveland Police Department and was the lead investigator into the triple homicides for some time until he relocated to Alabama several years later. Upon arriving at the scene, Det. Hampton observed that the kitchen door had been forcibly opened and

---

[1] To assist in the resolution of this proceeding, we take judicial notice of the record from the Petitioner's direct appeal. *See* Tenn. R. App. P. 13(c); *State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009); *State ex rel Wilkerson v. Bomar*, 376 S.W.2d 451, 453 (Tenn. 1964).

[2] The record reflects that Defendant Blair was originally thought to be a victim, but the grand jury issued a superseding indictment charging her with the murders as well.

[3] Judge Reedy later recused herself from all proceedings related to the two co-defendants' cases but remained on the Petitioner's case.

that there were items on the kitchen floor, including a knife, a cordless phone, and black wire "flex" ties. He further described the condition of the townhouse as follows: "There did not appear to be anything disarrayed or ransacked, . . . and upstairs was pretty much, if I can remember correctly, several bedrooms and nothing gone through or looked to be ransacked as well."

Raymond DePriest, formerly with the Tennessee Bureau of Investigation ("TBI") and employed with the Nashville Police Department as the Forensic Quality Assurance Manager at the time of trial, testified that, at the end of processing a crime scene, the TBI "always" conducted a search for contraband. Agents look "through every drawer, every cabinet in the house, . . . go through the washer and dryer just looking for any evidence that may be present[.]" After searching the Cleveland townhouse, agents did not find any evidence of controlled substances being present in the residence.

TBI Special Agent Luke Mahonen, a detective with the Cleveland Police Department at the time of the murders, testified that, on February 14, 1999, he responded to the triple homicide call and shot the initial crime scene video. Agent Mahonen described what he would typically look for at a crime scene: "One would have looked for items of value missing, items of value being present, ways that entry could have been made, whether the doors were locked or unlocked, signs of struggle, wallets, purses, things of that nature, currency, jewelry, things of value." When asked if he recalled finding any money at the scene, Agent Mahonen replied, "I don't recall, no."

The TBI sent a mobile crime scene unit to the townhouse to collect any possible forensic evidence. Agents recovered numerous items from the residence: clothing found at the top of the stairs belonging to Twanna Blair, wire ties, a cordless phone, a kitchen knife, a beer bottle near the back door, a "latch plate" from the back door, a fired .22 caliber bullet, fired and unfired .22 caliber cartridge cases, and a 9mm caliber bullet. DNA testing on blood samples recovered from inside the house revealed that the three victims or Twanna Blair were the sources of the samples. Only one unidentified sample was found inside the house, DNA present on a stamp, and it was never matched to anyone.

As result of the ensuing investigation, officers learned of an altercation between the [Petitioner] and OJ Blair just two days prior to the

- 3 -

murder. Tamara Rhea testified that, on the evening of February 12, 1999, she threw a party at her residence in Sweetwater and that about 100 people were in attendance.

Reginald Constant, OJ's cousin, testified that he was in custody being held as a material witness and that he had no criminal charges. Mr. Constant stated that he was at the February 12 party in Sweetwater, where he saw OJ Blair and the [Petitioner] involved in an altercation. Mr. Constant and several others "broke up" the fight. While standing in the yard, the group heard gunshots. According to Mr. Constant, the [Petitioner] then pulled out his gun and pointed it toward the porch. Mr. Constant said to the [Petitioner], "No, man it ain't even worth it," to which the [Petitioner] replied, "You are going to let them shoot at me and I can't shoot back." Mr. Constant responded, "Man, that's my cousin." The [Petitioner] then got in his vehicle and left. Mr. Constant stated that he was never afraid of the [Petitioner] because he had known the [Petitioner] for nineteen years and did not think he would shoot him. After the [Petitioner] left, Mr. Constant also left the party before the police arrived.

Charles Brewster, Jr., was also in custody, being detained for the purpose of testifying at the [Petitioner's] trial. Mr. Brewster was likewise in attendance at the February 12 party, where he witnessed two females get into a physical altercation. Mr. Brewster testified that he saw the [Petitioner] and OJ Blair get into a verbal argument, overhearing the two men doing a "bunch of cussing[.]" When he again saw the [Petitioner] on Saturday afternoon following the party, the [Petitioner] said to him "[t]hat he had handled the situation. He retaliated and handled the situation."

Desmond Deane Benton also testified about his recollection of the February 12 party. He recalled that the [Petitioner] and OJ Blair were "in each other's face. They was [sic] arguing and then all of the sudden they grabbed each other and they rolled out the front door off the porch onto the concrete, the driveway . . . . They started fighting and then shots broke out." According to Mr. Benton, when the shots were fired, everybody ran. Mr. Benton opined that OJ Blair was winning the fight.

Mr. Benton left the party and went to his girlfriend's house. Sometime later that evening, he returned to Tamara Rhea's apartment and saw Michael Younger at the trunk of his car, loading bullets into the clip of a black handgun. Mr. Benton stated that he had never seen the [Petitioner] with a gun.

- 4 -

After shots were fired at the party, officers were called to the scene, which, according to Officer Kenny Wilkins with the Sweetwater Police Department, was known for its drug activity. As Officer Wilkins was traveling to the scene, he encountered Ke[rr]y Rogers, who had been shot at the party. Officer Wilkins stayed with Mr. Rogers until emergency personnel arrived to assist him. Despite a lengthy investigation, no one was ever charged with Mr. Rogers' shooting.

While Officer Wilkins waited with Mr. Rogers, other officers continued to the scene "where the party had taken place." Once at the party, the officers arrested the [Petitioner] and took him to the local jail for questioning.

On February 14, 1999, around 2:00 a.m., Stacy Ann Clabough left The Party Zone, a club in Chattanooga, after Twanna Blair, OJ Blair, and Dawn Rogers failed to meet her there. When she returned to Cleveland, she went by the victims' townhouse to see why they had failed to attend. She knocked on the front door, and Twanna Blair answered. Twanna Blair told her that everyone was asleep, so Ms. Clabough returned to her car and left. As she was leaving the complex, she heard "a noise or something" that "caught [her] attention[.]" She turned to see someone sitting inside a dark, maroon vehicle. While she did not know the [Petitioner] at that time, she was able to later identify him as the man inside the car; she claimed she was able to remember the [Petitioner's] face due to the "shock." At the time of trial, Ms. C[la]bough was incarcerated for violating her probation on a prescription fraud conviction. Ms. Clabough also admitted that she had given several inconsistent statements to the authorities, that she had two forgery convictions, and that she had a tattoo commemorating OJ Blair's birth date.

Amy Lonas and the [Petitioner] were in "a friend with benefits relationship" in February 1999. Ms. Lonas, then eighteen years old, stated that, on the evening of the 12th, she was present at the party with the [Petitioner] and Michael Younger. She testified that she saw the [Petitioner] with a gun that evening and, according to Ms. Lonas, the [Petitioner] "always had a gun." When OJ Blair and Twanna Blair arrived at the party, the [Petitioner] said to Ms. Lonas, "They could die right there." Ms. Lonas and others told the [Petitioner], "No, don't do nothing like that." Ms. Lonas, who was underage and drinking and doing "a lot" of drugs, went back inside the house. After she heard gunshots, she left the party to

avoid the police and returned to her apartment that she shared with Tiffany Gray.

At approximately 2:00 a.m. on February 13, the [Petitioner], Michael Younger, and Jason McGaughey came to Ms. Lonas' apartment. All of the men were intoxicated, and Younger hit the front door so hard it fell off the hinges. Ms. Lonas stated that her apartment complex was "run down" and that the door was not in good condition at the time. Ms. Lonas became upset because she did not want to have to tell her roommate about the door. Mr. McGaughey stayed to fix the door.

According to Ms. Lonas, the [Petitioner] was agitated while he was at her apartment, and the men stayed approximately one and [a] half to two hours. While there that morning, Ms. Lonas and the [Petitioner] engaged in conversation. When discussing where the [Petitioner] was headed once leaving her apartment, he said that "he was going to get his money back." Ms. Lonas then asked the [Petitioner] "how much dope did you front him." The [Petitioner] replied that "it was none of [her] business." The men left the apartment on foot. The following day, February 14, Ms. Lonas learned of the triple homicide from the television news.

Around 7:00 or 8:00 a.m. on February 15, Ms. Lonas was taking out her trash, when she saw the [Petitioner]. Although the [Petitioner] was hostile, they again engaged in conversation. Ms. Lonas was upset with the [Petitioner] because he had been having sex with another woman. When talking about where he had been, the [Petitioner] said that "he had took care of it, . . . that he went to go get his money back, . . . he had done something real bad, . . . he was going to have to go away for a little while." The [Petitioner] described his arrival at the townhouse to Ms. Lonas: "Twanna knew he was coming, they knocked on the door like the police to get in the door, . . . that it was only OJ in that house." According to the [Petitioner], OJ pulled a gun on him first so he had to shoot in "self-defense." The [Petitioner] told Ms. Lonas that OJ was alive when he left the apartment and that, afterwards, he threw his gun in the Loudon County rock quarry. The [Petitioner] warned Ms. Lonas that she should "never tell anybody anything" about what he had told her or he would kill her. The two got into "an irate argument" and decided to no longer be friends. Ms. Lonas agreed to never tell anyone about what the [Petitioner] had told her.

Ms. Lonas admitted that she had criminal convictions for criminal impersonation in 1998 and shoplifting in 1999. According to Ms. Lonas,

she had since "changed [her] whole life" beginning in 2006. Ms. Lonas stated that she was now in college, studying medical assistance and medical billing, and had been a Certified Nurse's Assistant for the past three years. The police "found" her in 2006, and she then told the truth about what she knew about the murders. However, on cross-examination, Ms. Lonas acknowledged additional convictions for passing a worthless check and leaving the scene of an accident in 2006 and a simple possession charge in 2008.

Ranessa Macon testified that the [Petitioner] visited her on Sunday morning February 14. He woke her up, asked her to sit on the couch, and told her he had killed someone. After hearing the news, the [Petitioner] and Ms. Macon just stood in the middle of the room and hugged each other. She did not ask any further questions of the [Petitioner] about what he had done. She admitted that, back in 1999, she was "using drugs pretty heavily[.]"

Tamara Rhea spoke with the [Petitioner] a few days after the shootings, and the [Petitioner] was apologetic about fighting at Ms. Rhea's party. Ms. Rhea asked the [Petitioner] about the shootings, inquiring, "Did you have anything to do with that?" The [Petitioner] jokingly said, "You never know."

Approximately a week or two prior to the party in Sweetwater, the [Petitioner] told Analesha Harper that he had been beaten and robbed, but he did not know the perpetrator. The [Petitioner] again visited Ms. Harper sometime after the February 12 party. He told her that an altercation happened at the party, that OJ Blair "was there," and that he was drunk at the time. According to Ms. Harper, the [Petitioner] did not know who robbed him a few weeks prior to the party in 1999.

The [Petitioner] again visited Ms. Harper in early 2006 and, according to Ms. Harper, the [Petitioner] was upset because the television news had linked him to the murders. When Ms. Harper was asked if the [Petitioner] ever told her at a later date "who he thought had something to do with" the robbery that happened just a week or two prior to the party, she replied, "When I asked him about the murders he was like the guy OJ remember, that was the guy that I had the fight with[.]" Ms. Harper asked the [Petitioner] if he had anything to do with the murders, and he told her "no." Ms. Harper stated on cross-examination that she did not believe the [Petitioner] ever knew who robbed him in 1999.

Vanessa Latham testified that, in February 1999, she was having a relationship with the [Petitioner], that they "messed around for a long time." Ms. Latham was in attendance at the party at Tamara Rhea's house. Ms. Latham caught the end of the fight between OJ Blair and the [Petitioner]. To Ms. Latham, it looked like OJ Blair was "whipping" the [Petitioner]. When she heard gunshots, she went to a neighbor's house.

After the murders, Ms. Latham talked with the [Petitioner] in "Jake's parking lot"; they were "just chilling[.]" The [Petitioner] asked Ms. Latham if she knew "that guy from Cleveland," to which she responded affirmatively, and the [Petitioner] then said "we did that." Ms. Latham became upset because she had heard that one of the girls was pregnant. After she got upset, the [Petitioner] said that "the fucking bitch shouldn't have had her ass there[.]" He then threatened to kill Ms. Latham if she ever told anyone about what he had told her. Ms. Latham stated that she did not believe the [Petitioner] about the killings, that she did not know him to be a bad person, and that she did not know "if he was joking around or not."

Several years later, Ms. Latham was contacted by the police. She claimed that the authorities were threatening to put her in jail and take her kids away if she did not cooperate, so she agreed to make a recorded phone call to the [Petitioner]. Detective Duff Brumley of the Cleveland Police Department, who had taken over the investigation of the triple homicides after Det. Hampton's departure, was present when Ms. Latham placed the call to the [Petitioner]. According to Det. Brumley, in the first phone call, the [Petitioner] was "very reluctant to speak, was evasive, and asked Ms. Latham to go to a pay phone and call him or to a secure phone because he was afraid that his phone had been wire tapped." They then went to a pay phone, and Ms. Latham again phoned the [Petitioner]. A recording of this call was played for the jury. During the phone call, the [Petitioner] stated, "Now, Vanessa, listening [sic] to what I'm saying. Regardless of what me and you talked about nobody is going to know but me and you. Do you understand that?"

Stacy Marvin King testified that he had known the [Petitioner] since they were teenagers. Mr. King was incarcerated at the time of trial and had been since March 2006. Mr. King testified that, in February 2006, he was on his way home from work, when he stopped at an Applebee's restaurant in Athens to eat. There he saw the [Petitioner], and the two men spoke about the triple homicides in Cleveland in February 1999. According to

Mr. King, the [Petitioner] was "agitated with regard to the talk on the streets." The [Petitioner] said to Mr. King that "he wanted to resolve a problem he had, which was an individual still being alive and talking about events surrounding the murder." That individual was Twanna Blair.

While talking at Applebee's, the [Petitioner] described the murders to Mr. King. The [Petitioner] told him that, upon entry into the residence, he fired a shot at OJ Blair, killing him. The [Petitioner] continued, "[W]e heard a noise upstairs, we got the individuals upstairs," and "they were shot with the intent of not leaving anyone alive[.]" According to Mr. King, the [Petitioner] stated that his "negative situation . . . was only going to get worse" if he "didn't take out Ms. Blair[.]"

Mr. King acknowledged that he had been incarcerated many times; his current incarceration due to a federal firearms charge. He had multiple convictions for selling cocaine and firearm possession and had violated his probation several times. Mr. King confirmed that the federal prosecutor had filed a "5K1" motion on his behalf, stating that Mr. King had provided "substantial cooperation." Upon this motion, a federal judge can reduce a defendant's sentence.

Mark Blair testified that he was locked up in the Monroe County Jail in February 1999. He testified that he spoke with the [Petitioner] by telephone during that time, and the [Petitioner] told him "that he had killed some people." On another occasion, he and the [Petitioner] were walking around the track at the jail and talking, and the [Petitioner] informed him that, when he got out of jail, he was going [to] "put down a demo[.]" Mark Blair replied, "When you get out, . . . them youngsters ain't going to let you come out there and regulate or nothing." The [Petitioner] then said, "I ain't worried about what them youngsters think, . . . if they get in the way I will do them just like me and Money did down in Cleveland." According to Mark Blair, Michael Younger was also known as "Money." The [Petitioner] extrapolated to Mark Blair that he "handled the matter in Cleveland" after getting into a fight with OJ Blair at a party in Sweetwater. Mark Blair acknowledged that he had [a] significant criminal history, including convictions for firearm possession, selling cocaine, aggravated assault, and evading arrest. He stated that he contacted the authorities with this information and confirmed that he did hope to receive some favorable treatment based on his cooperation.

In 2001, Agent Mahonen began working with the TBI. Agent Mahonen obtained a wiretapping order for the [Petitioner's] cellular phone, and he had recorded over 300 of the [Petitioner's] telephone calls. Agent Mahonen selected one phone call in particular to play for the jury; it was an incoming call, placed from Jewelry Television, Incorporated, made on February 14, 2006, at 10:47 a.m. Agent Mahonen believed that the [Petitioner] was convicted of federal drug charges based upon information obtained during the wiretap of the [Petitioner's] phone. Agent Mahonen also agreed that, on more than one occasion, the [Petitioner] gave blood samples, hair samples, and fingerprints to the authorities.

In the years after the murders, TBI Special Agent Terry Arney, an expert in firearms identification, had been unable to match the cartridge cases or bullets from the scene to any particular weapon. Testing continued as late as 2007.

Following testimony from twenty-five witnesses, the State concluded its proof. The [Petitioner] then made a motion for judgment of acquittal on all counts. The court dismissed the conspiracy charge, but the other counts were to be submitted to the jury. The [Petitioner] then submitted proof in his defense.

Jason Juan McGaughey testified on behalf of the [Petitioner]. He confirmed that he had drug convictions and a criminal history spanning approximately eighteen years. Mr. McGaughey testified that he did not attend the party in Sweetwater. He did recall a visit to Ms. Lonas' apartment when he "messed her door up and she was tripping about her friend was going to put her out because the door was messed up." McGaughey testified that he was accompanied by Michael Younger, but the [Petitioner] was not with him on that occasion. Mr. McGaughey fixed the door, and they left.

The [Petitioner] testified and gave his version of the events. He admitted that, at the time of the murders, he sold drugs and had sexual relationships with a lot of women. The [Petitioner] denied any involvement in the murders.

According to the [Petitioner], he supplied the alcohol for Tamara Rhea's party on the evening of February 12, 1999. He did not take his gun to the party, and he did not know OJ Blair prior to the party. He had heard that some "people from Cleveland had arrived at this party[.]" The

- 10 -

[Petitioner] claimed he was watching two women fight when someone punched him in the back of the head. He turned to see three or four people hitting him and, as he was attempting to ward of the blows, the fight moved into the yard. One person "just kept coming" at him. Someone then fired a gun, and his attacker ran into the house. He did not recognize any of the men who attacked him.

The [Petitioner] was arrested after officers arrived at the scene of the party, and he was transported to the police station. Officers tested his hands for gunshot residue but did not find any, and the [Petitioner] was never charged with any offense connected to the party. After being released from the police station, the [Petitioner] walked to the hospital to see who had been shot. A lot of people from the party had gathered at the hospital, and he learned Kerry Rogers was the individual who had been shot. The [Petitioner] and others waited until Mr. Rogers was released from the hospital. The [Petitioner] then returned to the party, which had moved "two doors down from where the party" had originally begun. He drank and talked with people for two to three hours following his return.

The [Petitioner] testified that, after the killings, he gave two statements to the police. When the police questioned him a third time, he refused to cooperate. He confirmed that, several years later, he was in federal prison with Mark Blair and that they talked "all the time." The [Petitioner] denied ever making any incriminating statements to Mark Blair. After his release from federal custody, he did give a third statement to police. He also gave his fingerprints and DNA sample to authorities.

*Id.* at *1-8. After a jury trial, the Petitioner was convicted of three counts of first-degree felony murder and one count of especially aggravated robbery, and he was sentenced to life without the possibility of parole for each of the felony murder convictions and to twenty-five years for especially aggravated robbery. *Id.* at *1. This court affirmed the Petitioner's convictions and sentences for first degree felony murder but reversed and dismissed the especially aggravated robbery conviction. *Id.* Thereafter, the Tennessee Supreme Court denied the Petitioner's application for further review.

*Defendant Younger's case*

In order to put a number of the Petitioner's post-conviction issues into proper context, we must also consider the procedural history in co-defendant Michael Younger's case. Defendant Younger's trial began in May 2010. On July 17, 2010, Defendant

Younger filed a Motion for Interlocutory Appeal in this court. In granting Defendant Younger's Motion for Interlocutory Appeal, this court explained:

> Prior to and during trial, [D]efendant [Younger] filed two motions to dismiss the indictment, arguing prosecutorial misconduct in the form of *Brady* violations. One of the violations concerned the State's failure to turn over evidence of a State's witness, Anita Wilson, facing multiple charges for check fraud. The trial court found that violation egregious enough to order defense counsel to report the prosecutors to the Board of Professional Responsibility and the prosecutors to self[-]report the violation. Nevertheless, the court denied the [Defendant Younger's] motion to dismiss the indictment. As trial progressed, the State, on redirect examination, asked a witness, Pam Upton, a question about [Defendant Younger] being a "drug dealer," which question had been specifically prohibited by the trial court prior to trial during a Rule 404(b) hearing. When [Defendant Younger] objected, the prosecutor admitted he "decided" to ask the question based upon the defense's cross[-]examination of the witness. [Defendant Younger] again requested the trial court dismiss the indictment. The court recognized the State's error but refused to dismiss the indictment. At that point, [Defendant Younger] requested a mistrial, arguing that the defendant had been "goaded" into making the request by the State's continued bad behavior. The trial court found that the "improper testimony [about Defendant Younger's and the Petitioner's drug dealing] was directly solicited by the [S]tate's question" against the trial court's ruling prohibiting that line of questioning. The court further noted that there was little proof in the record linking [Defendant Younger] with the crime. The court found that a curative instruction would be insufficient to mitigate the error, stating, "I can't put the prejudicial proof back in the mouth of the witness." Accordingly, the trial court granted [Defendant Younger's] motion for mistrial.

*See State v. Michael Younger*, No. E2010-01541-CCA-R9-DD (Tenn. Crim. App. Oct. 11, 2010) (order granting interlocutory appeal).

In late June 2010, the State informed Defendant Younger's attorneys about an investigation into improper actions by Detective Duff Brumley.[4] The actions which led to the investigation and, ultimately, Detective Brumley's firing were unrelated to the

---

[4] The District Attorney's correspondence to Defendant Younger's attorneys was introduced as an exhibit at the post-conviction hearing.

instant case. However, a letter from the District Attorney's Office to Defendant Younger's attorneys also referenced the following:

In an unrelated matter, and in light of these recent events, I must also relate to you a conversation that I had with Detective Brumley some weeks before our 404(b) hearing in Bradley County in this case. Detective Brumley contacted me late in the evening and informed me that he had some really great news. He said that he had been talking with a "little birdy," and he knew how we could get into evidence a person's prior statement, even if they now claim memory loss. I knew of no such extant rule of evidence that would allow us to do so. Detective Brumley told me the exact Rule of Evidence number and subpart, read it to me, and explained that it was a brand new Rule of Evidence. He further said that his "little birdy" said she did not know why the State had not sought to use this new Rule of Evidence in the State's previous cases, as it had been passed prior to that trial. He said at the time that she did not give him the Rule number, but that she said it was a new rule and the only significant new rule passed that year. From there, Detective Brumley stated that he looked it up on the web search engine Google. Although Detective Brumley would not tell me the name of his "little birdy" friend who gave him this information, he did reveal that it was a female who was intimately aware of the state's case, all motions that had been filed by the state, all motions that had not been filed by the state, and who was aware of the passage of new Rules of Evidence.

Following these revelations, the State filed a Motion to Enter Nolle Prosequi ("Motion to Nolle") in Defendant Younger's case on October 19, 2010. The State's motion alleged:

1. The prosecuting officer in this case, [Detective] Duff Brumley, is currently under investigation for actions taken in his official capacity as a Cleveland Police Department officer. [Detective] Brumley has been terminated from his employment by the Cleveland Police Department.

2. In the course of the current investigation of [Detective] Brumley, three prior instances have been found which call into serious question [Detective] Brumley's credibility as a witness.

3. The first instance involved a prior homicide investigation wherein [Detective] Brumley testified under oath that he turned over recorded statements of a suspect directly to an Assistant District Attorney General.

However, in subsequent interviews, [Detective] Brumley gave inconsistent answers about who received the recorded statements. Ultimately it was determined that [Detective] Brumley did not give the recorded statements directly to an Assistant District Attorney General as he claimed under oath.

4. The second instance involved a federal court [c]ase, *United States v. Tiffany Little*, wherein Magistrate Judge Carter in a written -- opinion detailed numerous inconsistent statements made by [Detective] Brumley in his sworn testimony. These inconsistent statements included material facts that were important to a fair determination of the issues in the case and ultimately resulted in Magistrate Carter finding that he could place no confidence in the accuracy of [Detective] Brumley's memory. The case was subsequently dismissed.

5. In the current case, Anita Wilson, a key witness, has given a statement to counsel for the defense that [Detective] Brumley coerced her into claiming that [Defendant] Younger confessed to the murders. Counsel for the defendant brought this to the State's attention along with the fact that Ms. Wilson was held on a fugitive from justice warrant at [Detective] Brumley's direction. Subsequent investigation has found that Ms. Wilson was in fact held on a fugitive from justice warrant even though she was not wanted in another state. Her detention on a fugitive from justice charge was illegal. It certainly could be inferred that the illegal detention was intentional to give [Detective] Brumley additional leverage in taking the coercive actions that Ms. Wilson now maintains happened.

6. Ms. Wilson had given a prior statement in 2004 to Lieutenant Mark Gibson of the Cleveland Police Department. In that statement, Ms. Wilson makes no mention whatsoever of [Defendant] Younger confessing to the crimes in question. The presence of this prior inconsistent statement lends credence to Ms. Wilson's claims that she was coerced to give her latest statement incriminating [Defendant] Younger.

7. Following the previous trial of [Defendant] Younger which ended in a mistrial, [Detective] Brumley returned several pieces of evidence to the Cleveland Police Department. Rather than return the items to the evidence room as he should have done, [Detective] Brumley left the items in his office which was not locked. As such, the chain of custody is irrevocably broken as to those items.

8. The State of Tennessee cannot in good faith call [Detective] Brumley to the stand to testify in this matter as his credibility as a witness has been severely compromised.

9. Finally, and most disturbing, is approximately one hundred and seventy-one (171) telephone calls between [Detective] Brumley and Judge Amy Reedy, the presiding judge, during the time this case was progressing through the court system. A summary of the telephone calls has been attached as EXHIBIT 1.

10. While the State believes firmly that [Defendant] Younger is responsible for the deaths of the victims in this case, [Defendant] Younger is entitled to due process and a fair trial. No matter what reasons are given for the telephone calls between the prosecuting officer and the presiding judge, it does not absolve the State of its responsibility to see that [Defendant] Younger receives the due process afforded to him by law. The absolute appearance of impropriety in these telephone calls is such that the State cannot in good faith subject [Defendant] Younger to further criminal prosecution in this matter. There is no remedy in the law that will remove the taint that has been placed on this case as a result of these telephone calls. Any verdict, for or against conviction, would be viewed with suspicion.

A list of dates, times, and durations of the supposed phone calls between numbers associated with Detective Brumley and Judge Reedy was attached as an appendix to the Motion to Nolle. A hearing on the Motion to Nolle was held on December 17, 2010. By this time, Judge Reedy had recused herself in Defendant Younger's case, and the Honorable Jon Kerry Blackwood, Senior Judge, was appointed to preside over the hearing. At the hearing, the parties discussed the numerous phone calls alleged to have been made between Detective Brumley and Judge Reedy,[5] as well as purported *Brady* violations involving Anita Wilson. Judge Blackwood, in dismissing the indictment without prejudice, recounted the procedural history in Defendant Younger's case, focusing primarily on the State's "drug dealer" question, which led Judge Reedy to order a mistrial. Judge Blackwood stated:

But it's the Court's findings that the motion to dismiss, or the [Motion to Nolle] should be without prejudice . . . I don't intend to suggest anything

---

[5] As relevant to the Petitioner's case, the State's exhibit alleged that 78 phone calls were exchanged between the two numbers between October 6, 2008, and the start of the Petitioner's trial. According to the exhibit, no phone calls were placed between the two numbers during the time of the Petitioner's trial (August 17 through August 25, 2009).

except my interpretation from reading a cold record, and listening to the arguments of counsel. I don't intend that to be taken as any comment about anything that's happened in this case favorably or unfavorably or . . . however you may take it . . . or to comment about the propriety of any actions that have been taken in the case. This is a decision based upon what I believe to be the law . . . in the state of Tennessee.

Following the trial court's granting of the Motion to Nolle, the State and Defendant Younger filed a joint Motion to Dismiss his interlocutory appeal, which this court granted on December 21, 2010.

*The Petitioner's direct appeal*

The Petitioner filed his notice of appeal in May 2010, and this court issued its opinion in the Petitioner's case on August 16, 2011; thus, the proceedings in Defendant Younger's case described above all occurred while the Petitioner's case was pending on direct appeal. In December 2010, trial counsel attempted to raise the issue of the State's dismissal of Defendant Younger's case by filing a Motion to Consider Post-Judgment Facts in this court, but the court denied the motion, stating:

> The [Petitioner], through counsel, has filed a motion to consider as post-judgment facts the "admissions" of the District Attorney General made in a motion to enter a *nolle prosequi* filed in *State [] v. Michael Younger,* Bradley County Criminal Court case number 08-457, a co-defendant's case. The motion filed by the prosecutor in the *Younger* case calls into question the credibility of Duff Brumley, the State's prosecuting witness in both the *Younger* case and the [Petitioner's] case. The State argues in opposition to the motion that the assertions made by the prosecutor in the *Younger* motion do not constitute post-judgment "facts" capable of consideration by this court pursuant to Rule 14 of the Rules of Appellate Procedure. The State's position is well-taken. *See* Tenn. R. App. P. 14, Advisory Comm'n Comments (stating that rule permits consideration of only those post-judgment facts "unrelated to the merits and not genuinely disputed" in order to "keep the record up to date" and "is not intended to permit a retrial in the appellate court"); *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988) ("Allegations contained in pleadings are not evidence."). Accordingly, the [Petitioner's] motion is denied.

*State v. Maurice Johnson*, No. E2010-01142-CCA-R3-CD (Tenn. Crim. App. Jan. 28, 2011) (order denying Motion to Consider Post-Judgment Facts).

In December 2012, the Petitioner filed a timely pro se petition for post-conviction relief, alleging that he received ineffective assistance of counsel and that the State committed a *Brady* violation. The Petitioner filed a pro se amendment to the petition, and following the appointment of post-conviction counsel, he filed a second amended petition, to which the State filed two written responses. At an evidentiary hearing conducted in March 2016, the Petitioner called two witnesses. Michael J. Cohan testified that he was a private investigator with thirty-one years' experience and that he was hired by trial counsel as an investigator in the Petitioner's case, after trial counsel's initial request for funding was approved by the Administrative Office of the Courts (AOC) on February 23, 2007. He recalled that the case was a "seven-year[-]old murder" and that the State filed a death notice. Mr. Cohan testified that he met with the Petitioner to discuss the case in both June and July of 2007. Although Mr. Cohan had not yet received a copy of discovery, he had a copy of the lengthy Task Force Report produced by investigators and an affidavit for a search warrant relating to the case. Mr. Cohan took "the two of those and pulled witnesses and witness information from [the documents]." Mr. Cohan spoke to the investigator for Defendant Younger in July 2007 and learned that counsel and the investigator for Defendant Younger had met with Detective Duff Brumley, the lead detective on the case, for three hours and that they had "boxes of discovery." Mr. Cohan sent an email on July 19, 2007, to trial counsel about the three-hour meeting Defendant Younger's counsel had with Detective Brumley and asked trial counsel if it was possible for them to set up a meeting with the detective.

Based on trial counsel's instructions, Mr. Cohan met with Lois Patterson and interviewed her. Ms. Patterson stated that the Petitioner had been staying at her house at the time of the murders, but she did not provide the Petitioner with an "absolute alibi." Mr. Cohan took two trips in July 2007 to meet with the Petitioner and discuss the case. In an email sent to trial counsel in August 2007, Mr. Cohan again "nagged" trial counsel about discovery. He received a response from trial counsel which stated, "I have been nagging my secretary about the same things. I will double my efforts." On September 13, 2007, Mr. Cohan sent another email to trial counsel stating, "I am not in a hurry, got plenty to do, we are on hold until we can get discovery and talk to the cop."

---

[6] The State sought Judge Reedy's recusal from the post-conviction proceedings based on issues discussed in this opinion, but the trial court denied the motion. The Petitioner then joined the State in its interlocutory appeal to this court, but this court affirmed the trial court's ruling. *See Maurice Johnson v. State*, No. E2013-02060-CCA-R10-CO (Tenn. Crim. App. Sept. 17, 2013) (order denying interlocutory appeal). In August 2014, however, Judge Reedy lost her reelection bid, and the Honorable Don R. Ash, Senior Judge, was appointed to preside over the Petitioner's post-conviction proceedings.

Mr. Cohan testified that he had no further contact from trial counsel in October, so he sent another email on November 5, 2007, stating:

> Just checking in so you don't think I am dodging you. We are stuck until we get the rest of discovery and talk with the cop. If . . . that is unacceptable, I need guidance. We got no mitigation. I suspect that you have a deal in the works, but I am just checking in.

Following this email, Mr. Cohan did not have any contact with trial counsel from January 2008 through June 2008, nor did he receive a copy of discovery. In July 2008, Mr. Cohan emailed trial counsel asking if trial counsel would sign a certificate for a bill that he had submitted to trial counsel previously, but trial counsel did not respond until December 2008.

Mr. Cohan testified that he received a copy of discovery on February 10, 2009. He explained that the discovery, which was contained in multiple banker's boxes, was voluminous and "[o]verwhelming." Mr. Cohan began the lengthy process of organizing and summarizing the information contained in discovery. Upon review, he identified 112 potential witnesses and noted that the discovery contained multiple statements from witnesses, all of whom he needed to interview if possible. Mr. Cohan explained that the "idea is to know what they are going to say, not just what the statement says, in case those things are not necessarily the same, or in case they say something else that is not in the statement." In April 2009, Mr. Cohan emailed trial counsel and informed him that the authorization for funding was almost depleted, as there was only $115 left of the authorization. On April 28, 2009, Mr. Cohan provided trial counsel with an affidavit and order for additional funding and asked trial counsel to get it signed. However, he did not receive a response from trial counsel. On July 7, 2009, Mr. Cohan received an email from co-counsel, who sat second chair on the Petitioner's case, requesting that Mr. Cohan talk to a witness. Mr. Cohan told co-counsel that he was "on hold" because they had been "out of money for some time now." He did not receive a response from co-counsel.

Mr. Cohan recalled that he received a telephone call from trial counsel's secretary on July 23, 2009. The secretary said that trial counsel needed a new copy of the order and affidavit that Mr. Cohan had previously provided him. The secretary also told Mr. Cohan that the Petitioner's case was "going to trial in August." That evening, Mr. Cohan faxed trial counsel a letter, stating that he was withdrawing from the case because there was "no way we could conduct this investigation in 24 days." Mr. Cohan stated, "You can't go find 150 people in 24 days, I mean, they are not standing on the street corner waiting on you." Mr. Cohan testified that he never met with Detective Brumley.

As part of discovery, Mr. Cohan learned that a federal inmate, Antwon Cook, had made a statement to Detective Brumley and an Assistant United States Attorney that implicated Kerry Rogers[7] in the murders. Mr. Cook advised that Mr. Rogers told him that "the Valentine's Day triple homicide was 'some of his work.'" Mr. Cohan also learned from a "lead sheet" contained in discovery that Stacy Clabough made multiple statements to investigators. In one statement dated October 11, 2005, Ms. Clabough admitted that she had been in the victims' residence around 3:00 a.m. on the day of the murders. She said that she spoke momentarily to OJ Blair and Twanna Blair and then left the residence. Ms. Clabough also disclosed that she "[h]eard it was Kerry Rogers."

Mr. Cohan explained that the Task Force Report contained a statement from another federal inmate, Jerome Hadley, implicating Mr. Rogers. According to Mr. Hadley, Mr. Rogers told him, "I was there, I know what happened but I'm not going to talk to the police about that." Mr. Cohan testified that discovery also contained investigators' notes about an interview with federal inmate, Charlie Stephenson, who said that he sold two guns to Mr. Rogers and that those guns were used in the victims' murders. Mr. Stephenson said that Mr. Rogers drove a "white Corvette with flip up headlights" at the time. Also in discovery was an investigative lead report regarding a man named John Thomas, who stated that OJ Blair "got his drugs from Kerry Rogers[.]" Mr. Cohan testified that trial counsel gave him no instructions in regards to these witnesses. He stated that, had he been given instruction and appropriate funding, he would have attempted to find these witnesses.

Mr. Cohan also testified about witnesses identified in a TBI report. He explained that, in a sworn statement, Jennifer Folliett told investigators that she had received a letter, which contained a photograph of victim Dawn Rogers, which stated, "You are next n***** lover to kill a whore." Mr. Cohan stated that trial counsel did not instruct him to interview Ms. Folliet about who may have sent the letter. The TBI report also contained a lengthy statement from William Neely, who implicated Ronnie Cox, Corey Davis, and Jeff Roarke in the homicides. Mr. Neely said that both Mr. Cox and Mr. Davis admitted to him that they murdered the victims and that he saw blood on their clothing. He explained that the victims were murdered because OJ Blair was "messing around with [Mr. Roarke's] girlfriend." In additional investigative lead sheets, Mr. Cohan discovered that Faye Lindsey and Kenyatta Waters told investigators that the murders were connected to a fight the night before between "the Roarkes," OJ Blair, and Twanna Blair. A man named Larry Hardy also spoke to investigators and implicated Corey Davis. Jill Flowers told investigators that, following the murders, Twanna Blair told her that "three

---

[7] Mr. Rogers' name is spelled as both Kerry Rogers and Carey Rodgers throughout the record. For consistency with this court's opinion on direct appeal, we will spell his name as Kerry Rogers.

- 19 -

white men dressed in police uniforms" committed the murders. Trial counsel provided Mr. Cohan no instruction in regards to these witnesses.

Mr. Cohan recalled that there were two sworn statements in discovery from Vanessa Latham. In the first sworn statement, given on November 23, 2005, Ms. Latham told investigators that the Petitioner had never spoken to her about the murders; she stated that the Petitioner was "not the type of person to kill someone himself, I don't think. I think he could have someone do it for him." However, Ms. Latham provided a second sworn statement six days later, in which she said that the Petitioner confessed to her that he committed the murders.

Additionally, police reports contained in discovery indicated that Stacy Clabough had given four statements to various investigators with the Cleveland Police Department. In the first statement, provided February 17, 1999, Ms. Clabough said that she was at the Sweetwater party the night before the murders and that the Petitioner "kept talking about getting a gun." She also said that she was at the victims' apartment for about five minutes around 3:30 a.m. on February 14 and that she saw OJ Blair and Twanna Blair at the residence. Ms. Clabough stated that she had heard that John Garrett, victim Dawn Roger's ex-husband, "might have had something to do with the killings[.]" In a second statement dated March 22, 2000, Ms. Clabough again stated that she went to the victims' apartment around 3:00 a.m. on February 14; she said that she spoke to Twanna Blair briefly and saw OJ Blair sitting on the couch. Ms. Clabough was interviewed again on October 11, 2005, and she initially stated that there was no answer at the door to the victims' apartment when she knocked on the door at 3:00 a.m. However, Ms. Clabough then acknowledged entering the residence and speaking to both OJ and Twanna Blair "momentarily." Ms. Clabough recalled seeing a white sports car, a red car, and a black truck in the parking lot of the victims' apartment building. She stated that OJ Blair sold drugs and that "[e]verybody sa[id] he got killed because of it." Finally, Ms. Clabough provided a sworn statement to Detective Brumley on January 22, 2008, when she was incarcerated in the Bradley County Jail on a probation violation. She admitted that she had withheld information in her previous interviews "out of fear[.]" Ms. Clabough stated that, when she arrived at the victims' residence around 3:15 a.m. on February 14, Twanna Blair answered the door, "said they were asleep and closed the door." Ms. Clabough said that the door was "only cracked" open, and "it was hard to see." She explained that, as she walked back to her car, she saw a black male sitting in the driver's seat of a red car wearing a dark colored stocking cap or toboggan. She described the man as "tall and thin."

Mr. Cohan agreed that he could not say whether any of these potential witnesses could have been located and that he had no idea what they would have said if he had talked to them. However, he stated that it was important to act quickly in an investigation

because it increased the likelihood that witnesses would be living in the same place and could, thus, be located by the investigator and because the sooner they could be located, "the better the [witnesses'] memories [were.]"  Mr. Cohan explained that he needed to review discovery before talking to witnesses because "99 percent of the time[,] after we talk to them, they are not going to talk to us again."

Trial counsel testified that he had practiced law since 1988 and that he and the District Public Defender were appointed to represent the Petitioner in early 2007.  Trial counsel recalled that the Petitioner was charged with first degree murder, along with two co-defendants, and the State had filed a notice to seek the death penalty in the Petitioner's case.  After his appointment, trial counsel began to familiarize himself with the case; he spoke to the Petitioner and to witness Lois Patterson.  He also discussed the case with the State and with the Public Defender.  Trial counsel explained that he let the Public Defender get discovery because his office was in Cleveland and trial counsel's office was not.  Trial counsel stated, however, that the Public Defender provided him a copy of discovery, and he went to the Cleveland Police Department to "review some things" on several occasions.  Trial counsel estimated that he worked hundreds of hours on the Petitioner's case.  He recalled that the State's case was circumstantial, with no forensic evidence connecting the Petitioner to the crime.  Trial counsel acknowledged that he was never able to "firm up" Ms. Patterson as an alibi witness.  Trial counsel testified that the Public Defender eventually discovered a conflict, and the trial court appointed co-counsel as second chair.

The Petitioner went to trial in August 2009.  Trial counsel explained that because the homicides occurred in 1999 and the investigation continued over eight years, there was "a lot" of discovery, and it was provided to trial counsel "in waves."  He stated that he had some of discovery by March 3, 2008, which included information about federal wiretaps conducted on the Petitioner.  Trial counsel recalled that funding for an investigator was approved on February 23, 2007, and he hired Mr. Cohan.  Trial counsel agreed that his records showed that he corresponded with Mr. Cohan for a total of 5.1 hours before trial.  He acknowledged that Mr. Cohan did not interview any witnesses other than Ms. Patterson.  Trial counsel stated that he also interviewed Ms. Patterson, who provided trial counsel with contact information for "a lot of the witnesses" and helped in "getting some of the witnesses . . . to [trial counsel's] office."  Trial counsel agreed that he billed the AOC for a total of 4.6 hours for talking to witnesses and 5.9 hours for speaking with the Petitioner.

He stated that he discussed with the Petitioner, both before and during trial, whether the Petitioner would testify, and the Petitioner decided to testify.  Trial counsel recalled that, in preparation for the Petitioner's testimony, he talked to the Petitioner about the events at the party in Sweetwater.  They also discussed the Petitioner's

relationship with several of the women who were set to testify for the State. Trial counsel discussed the Petitioner's criminal history and how they would approach it if the Petitioner testified. Trial counsel agreed that he did not practice specific questions with the Petitioner to prepare his testimony. However, trial counsel stated that he knew the Petitioner would say that he was not sure where he was when the murders took place because "it was eight years later." Trial counsel explained:

> [T]here was always some question about where he was, because even when we were looking at the possibility of an alibi, there w[ere] some things that we couldn't firm up dates.

> ….

> I mean, and remember, we are trying to piece all this together seven years later or eight years later.

> ….

> Well, it is unhelpful for him to lie and say he is somewhere that can later be proved he wasn't there. And plus, we were in a situation where three or four women had said that [the Petitioner] had felt the need to unburden himself to them. And, you know, it is easy to potentially call one woman a liar, but it is a whole lot harder to call four women a liar. And so at that point, basically, if [the Petitioner] sits over there in stone silence, then that's going to confirm in a lot of people's mind that, well, then, they must be telling the truth and he must be lying.

Trial counsel stated that he spoke to the Petitioner about testifying until the Petitioner was comfortable and "knew how to carry himself [and] how to answer questions." He explained, "Of course, we would give [the Petitioner] the speech of: Just answer the question asked and don't volunteer information, and that sort of thing."

Trial counsel stated that, as part of trial strategy, they decided to have the Petitioner testify and admit that he was a convicted drug dealer. Trial counsel testified that his strategy was to be forthright with the jury regarding the Petitioner's drug dealing while advancing the theory that the Petitioner was "not the type of person who would kill someone." As such, trial counsel did not object to testimony regarding a conversation between a State witness and the Petitioner that took place while the Petitioner was incarcerated in federal prison.

Trial counsel testified that he called Twanna Blair—who was charged with the murders and with aggravated perjury—as a witness at trial for the sole purpose of authenticating her voice on the 911 recording. He explained that her attorney objected repeatedly to her testifying, and at some point, Defendant Blair invoked her Fifth Amendment rights. When asked why he did not question Defendant Blair about her earlier statement to police in which she said it was "three white guys [who] did it," trial counsel replied, "I don't remember how the decision was made with regard to that." He stated that he did not recall seeing a document in discovery which showed that Defendant Blair's hands tested positive for gunshot residue. Trial counsel agreed that, had he known this information, he would have wanted to present it to the jury.

Trial counsel stated that the theory of defense was that unknown individuals shot the victims, that the Petitioner was never at the victims' apartment in Cleveland, and that the Sweetwater party did not provide motive for the murders. He agreed that five people interviewed by police implicated Kerry Rogers in the killings and four people implicated Jeff Roarke, Corey Davis, and Ronnie Cox. He agreed that Mr. Cook and Mr. Hadley were potential witnesses that he would have wanted to talk to about Mr. Rogers' involvement in the crime. When shown the letter received by Ms. Folliett threatening Dawn Rogers, trial counsel stated that he did not recognize the letter but that he would have wanted to talk to Ms. Folliett about the letter prior to trial. Trial counsel acknowledged that Mr. Neely, who had seen a pistol burn on Mr. Cox's body, was not interviewed about his statements to police. He stated that none of these potential witnesses testified at trial.

Trial counsel explained that the State's theory was that there had been a fight between the Petitioner and OJ Blair the night before the murders while they were at a party in Sweetwater and that the Petitioner had taken revenge against OJ Blair for the fight. Trial counsel acknowledged that Ms. Lindsey told police that OJ Blair and Twanna Blair had been in a fight with "the Roarkes" at the Sweetwater party, which would "indicate that there were other people out there with the exact same motive." Additionally, Ms. Waters' statement to police appeared to corroborate that there had been a fight between "the Roarkes" and OJ Blair.

Trial counsel testified that trial witness Vanessa Latham gave at least two statements to investigators. He recalled that Ms. Latham testified consistently with her second statement, *i.e.,* she said that the Petitioner admitted to her that he killed the victims. However, Ms. Latham made a statement six days prior to trial, in which she said that the Petitioner was not the type of person to kill someone but that she thought "he could have somebody do it for him." Trial counsel could not recall if Ms. Latham was confronted with the first statement on cross-examination at trial. Trial counsel testified that Ms. Latham participated in two recorded phone calls with the Petitioner as part of the

- 23 -

police investigation and that the Petitioner made comments during these calls "that could be interpreted in a damaging way."

Regarding witness Stacy Clabough, trial counsel recalled that she testified at trial that she saw a man fitting the Petitioner's description in a car outside the victims' apartment the morning of the murders but that her first three statements to police did not mention this. Additionally, Ms. Clabough's third statement to police implicated Kerry Rogers. Trial counsel acknowledged that Ms. Clabough was not confronted with these prior statements, explaining that he purposely did not ask her about these prior statements because of trial counsel's previous hearsay objections against the State.

Trial counsel testified that he could not recall why he did not raise issue of prosecutorial misconduct in the motion for new trial and agreed that his failure to do so caused the issue to be waived on appeal. Prior to the conclusion of the direct appeal, the State entered the Motion to Nolle in Defendant Younger's case "due to the fact that Detective Brumley was under investigation at that time for some actions that had resulted in him losing his job." In response, trial counsel filed a Motion to Consider Post-Judgment Facts with the appellate court. In the motion, trial counsel alleged that the State believed that Anita Wilson, who testified against the Petitioner, was held on a fugitive from justice warrant that did not exist and that her testimony was coerced. The motion was unsuccessful, and trial counsel did not raise the Brumley issue either as plain error or by filing a petition for writ of error coram nobis on behalf of the Petitioner. He explained that he considered the possibility of filing for coram nobis relief, but he "didn't believe that that was going to be enough to where the [c]ourt was going to say that . . . [the Petitioner] was prejudiced to the extent" required for coram nobis relief.

Trial counsel agreed that, at trial, the State suggested that it would not mention that the Petitioner had been in federal prison, but trial counsel said that it was okay to mention it because "[g]iven the approach that we were leaning toward, as far as [the Petitioner] being open and aboveboard about his history, about what he had done, about where he had been, that we did not see that that was something that would be damaging." He explained that the trial strategy was to portray the Petitioner as "a drug dealer but not a killer." Trial counsel acknowledged, however, that he could have asked about whether a trial witness was expecting a reduction in his federal sentence without allowing the jury to hear that the Petitioner had been in federal prison.

Trial counsel had no explanation as to why there was a two-year period during which the Petitioner's investigator did nothing on the case. He recalled that, when the Petitioner's case was set for trial in August 2009, he filed a Motion for Continuance, but the motion was denied. Trial counsel agreed that the jury never had an opportunity to consider Kerry Rogers or Jeff Roarke as alternative suspects. However, trial counsel

stated that he was not aware of any exception to the hearsay rule that would have allowed hearsay statements about other suspects into evidence.

The State called co-counsel to testify. Co-counsel stated that he was appointed as second chair on the Petitioner's case in the spring of 2009. Co-counsel met with the Public Defender and retrieved his file on the Petitioner's case. Co-counsel then organized the file, discussed with trial counsel the State's case and general trial strategy, and sent out jury questionnaires. He testified that he spent a lot of time organizing the Public Defender's file because when he received it, the file was "just thrown into more and more boxes." Co-counsel recalled that the evidence against the Petitioner was circumstantial. Although the State presented witness statements implicating the Petitioner, it presented no forensic or physical evidence. Regarding witness statements implicating the Petitioner, co-counsel stated:

> And in my assessment, the number of those statements was somewhat troubling, you know, given the fact that maybe you could discredit one person or two persons. But if you had five or six, it makes it much more difficult. That was what I thought was the strong point[] of the State's case.

Co-counsel believed, however, that there were other persons with the "motive and opportunity" to commit the offenses.

Co-counsel recalled that he sent an email to Mr. Cohan, asking that Mr. Cohan interview a witness. However, Mr. Cohan told him that they were "out of money." Co-counsel testified that he would have expected Mr. Cohan to attempt to interview witnesses, and he agreed that it was trial counsel's role to direct the investigator and follow up with him. Co-counsel recalled that he and trial counsel spoke to the Petitioner about whether or not to testify "at different times in the trial[.]" Co-counsel stated that, as part of trial strategy, they did not try to hide the fact that the Petitioner had a federal drug conviction and "was known as the guy that kind of ran the drug trade in the Sweetwater area." He explained:

> . . . I would assume one of the reasons a lot of times you would not want a defendant to testify is because they have a serious criminal record that you are trying to keep out in front of a jury, but I know in this case that I think we were upfront maybe in opening argument even that [the Petitioner] had a criminal record, he was serving time for a federal drug conviction. We didn't try to hide any of that fact, that he was somewhat known as maybe the -- I don't want to use the word, drug kingpin, because that's not what we said. But maybe he was known as the guy that kind of

ran the drug trade in the Sweetwater area. And we let the jury know that up front.

And I think we did discuss with him at different times testifying in that, you know, obviously, if he testified, he was going to be subjected to cross-examination and was going to have to answer some things and explain some things and would be on display, so to speak, for the jury, so -- but I am sure we did discuss that with him.

Co-counsel stated that he was no longer on the case at the time the post-trial motions were filed. He recalled, however, that the District Attorney General was "adamant" that the Petitioner's counsel needed to file something against the trial judge. Co-counsel stated, "But I did not feel that Judge Reedy treated us at all unfairly in this trial. . . . She was much harder on the District Attorney General's Office than on us."

Following the hearing, the post-conviction court entered a lengthy written order denying post-conviction relief. This timely appeal follows.

## II. Analysis

### A. Standard of Review

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

*B. Ineffective Assistance of Counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

## 1. Failure to adequately investigate potential witnesses

The Petitioner contends that trial counsel rendered ineffective assistance based on his failure to investigate potential witnesses and potential exculpatory information contained in discovery.[8]  The Petitioner asserts that because of the lack of any real investigation, trial counsel was unaware that multiple individuals had implicated a third party in the murders, thereby depriving the Petitioner of his ability to effectively raise the defense of third-party guilt.  The State responds that the Petitioner failed to prove that trial counsel rendered ineffective assistance of counsel for failing to investigate witnesses when those witnesses were not called at the evidentiary hearing.

In denying relief, the post-conviction court found that trial counsel's preparation to try the Petitioner's case was "inadequate," explaining that "[trial] [c]ounsel should have taken a more active role in directing Mr. Cohan to review discovery, interview witnesses, and conduct a thorough factual investigation, particularly in light of the State's seeking the death penalty at trial."  The post-conviction court stated:

> The discovery in this case referenced numerous potential witnesses who at one point either implicated someone other than the [P]etitioner as the perpetrator of these offenses or stated the [P]etitioner was not involved in committing the offenses.  One would expect a reasonable defense attorney to have investigated the veracity of these statements through interviewing these potential witnesses and determining whether this information would have been beneficial for the [P]etitioner at trial.  Trial counsel failed to do so in this case; trial counsel's failure to pursue this potentially exculpatory information constituted deficient performance.

However, because the Petitioner failed to present any of the potential witnesses at the post-conviction hearing, the post-conviction court could not determine "whether any of these witnesses would have offered credible trial testimony consistent with their purportedly exculpatory statements."  Accordingly, the post-conviction court found that the Petitioner failed to establish that he was prejudiced by trial counsel's failure to investigate and present the witnesses at trial.

Trial counsel has a duty to "conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed."  *Baxter*, 523 S.W.2d at 933.  "[C]ounsel has a duty to make reasonable investigations or to make a reasonable

---

[8] Based on the exhibits introduced by the Petitioner at the post-conviction hearing, the potential witnesses would include: Antwon Cook, Jerome Hadley, Charlie Stephenson, John Thomas, Jennifer Folliett, William Neely, Faye Lindsey, Kenyatta Waters, Larry Hardy, and Jill Flowers.

decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691; *see also State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). However, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691.

When a petitioner claims that trial counsel was ineffective for failing to discover, interview, or present a witness in support of the petitioner's defense, such witness should be presented at the post-conviction hearing. *State v. Black*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). As this court has previously stated:

> As a general rule, this is the only way the petitioner can establish that (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner. It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel.

*Id.* Without presenting the witness's testimony at the post-conviction hearing, the petitioner generally cannot establish prejudice under *Strickland*. *Id.* at 758.

We agree with the post-conviction court that trial counsel's investigation into potential witnesses was inadequate and deficient. Nevertheless, we also agree with the post-conviction court that the Petitioner has not established that he was prejudiced by trial counsel's deficient performance. Although we certainly do not condone trial counsel's failure to conduct a proper investigation, the record reflects that only trial counsel, co-counsel, and the defense investigator testified at the post-conviction hearing. The Petitioner failed to offer the testimony of any of the potential witnesses whom he contends that trial counsel should have investigated. The Petitioner asserts that the post-conviction court did not need to speculate as to the potential witnesses' trial testimony because the witnesses had given prior statements to police, which the Petitioner introduced as exhibits at the hearing. However, without the witnesses' testimony at the post-conviction hearing, it is impossible to conclude that the witnesses would have testified credibly and consistently about their prior statements to police and implicated other individuals in the crime. The witnesses could have simply recanted their statements

if called to testify. Moreover, we cannot properly evaluate these statements as we have no way of knowing the circumstances under which the statements were made or the source of the witnesses' knowledge. As such, the Petitioner has not established prejudice under *Black*.

The Petitioner argues that "the holding in *Black* [] does not apply" to his case, citing the unpublished case of *Tavarus U. Williams v. State*, No. 02C01-9711-CR-00423, 1998 WL 742348, at *7 (Tenn. Crim. App. Oct. 23, 1998).[9] In *Tavarus U. Williams*, the fifteen-year-old petitioner shot and killed the victim outside of a bar in Memphis. *Id.* at *1. The petitioner was tried as an adult and convicted by a jury of first degree premeditated murder, for which he received a life sentence. *Id.* At an evidentiary hearing on his post-conviction petition, the defense investigator testified that she located an unbiased eyewitness, who was available and willing to testify on the day of trial that the victim had been pulling a gun on the petitioner when the petitioner shot him, but the eyewitness was not called to testify due to trial counsel's lack of preparation. *Id.* at *3-4. The eyewitness's name was not recorded, and the defense investigator could not recall the name during the evidentiary hearing. *Id.* at *7. The post-conviction court denied relief on the claim of ineffective assistance of counsel because of the petitioner's failure to call the eyewitness at the post-conviction hearing. *Id.* On appeal, this court concluded that it was "fundamentally unfair to hold this failure of proof against the [Petitioner]" when the defense investigator had no written record of the eyewitness's name and could not recall it, and trial counsel testified that he had never known about the witness. *Id.* The court, therefore, concluded that the best evidence the petitioner had of the crucial testimony was the defense investigator's testimony, which he produced at the hearing. *Id.* Accordingly, the court held that the *Black* rule was inapplicable to the petitioner's case. *Id.*

*Tarvarus U. Williams* is distinguishable from the instant case. In this case, the defense investigator, Mr. Cohan, did not interview the potential witnesses advanced by the Petitioner nor did he testify that they were readily available and willing to appear at trial. Mr. Cohan admitted that he did not know whether any of the potential witnesses could have been found or whether they would have talked to him. Unlike the situation in *Tarvarus U. Williams*, the identities of the potential witnesses are easily ascertainable through the records provided to the Petitioner in discovery and admitted as exhibits at the

---

[9] As aptly noted by the State, in the nineteen years since *Tavarus U. Williams* was decided, it has been cited only three times by this court, each time to distinguish it. *See John Smith v. State*, No.W2015-00633-CCA-R3-PC, 2016 WL 3345247, at *6 (Tenn. Crim. App. May 27, 2016), *perm. app. denied* (Tenn. Oct. 17, 2016); *Thomas Cothran v. State*, No. M2008-01071-CCA-R3-PC, 2009 WL 4438542, at *8 (Tenn. Crim. App. Dec. 3, 2009), *perm. app. denied* (Tenn. May 11, 2010); *Robert K. Holloway v. State*, No. M2005-02273-CCA-R3-PC, 2007 WL 1425463, at * (Tenn. Crim. App. May 15, 2007), *perm. app. denied* (Tenn. Sept. 24, 2007).

post-conviction hearing. In his brief, the Petitioner asserts that the passage of time has caused the potential witnesses to be unavailable, but he offered no proof at the evidentiary hearing that he sought out any of these witnesses but was unable to locate them. *Tarvarus U. Williams* does not apply to the instant case, and the Petitioner failed to establish prejudice under *Black*. Accordingly, he is not entitled to relief.

<u>2. Failure to investigate and interview witnesses who testified at trial</u>

The Petitioner also contends that trial counsel was ineffective based on his failure to investigate and interview two witnesses who testified at trial—Vanessa Latham and Stacy Clabough. The Petitioner asserts that, if trial counsel had conducted a proper investigation into the witnesses, trial counsel could have cross-examined the witnesses about their inconsistent statements to police.

In addressing this issue, the post-conviction court noted that the Petitioner did not call Ms. Latham and Ms. Clabough to testify at the post-conviction hearing. Therefore, the post-conviction court was unable to determine whether the witnesses would have offered credible trial testimony that was consistent with their pretrial statements. The post-conviction court found that, without the testimony from Ms. Clabough regarding Kerry Rogers, the court had "no way of knowing the circumstances under which Ms. Clabough made this statement regarding Mr. Rogers or the source of her knowledge." Additionally, the post-conviction court stated that trial counsel appeared to recognize that "Ms. Clabough's potential testimony regarding Mr. Rogers may well have been excluded as hearsay had [trial] counsel sought to introduce such testimony (or Ms. Clabough's statement) at trial." Without being able to ascertain whether the potential testimony and underlying statement would have been admissible, the post-conviction court could not conclude that the Petitioner was prejudiced. Regarding Ms. Latham, the post-conviction court found that Ms. Latham's trial testimony revealed some of the information that the Petitioner claimed trial counsel did not investigate and present to the jury. Thus, "although counsel did not introduce Ms. Latham's statement in trial, [trial] counsel was able to question Ms. Latham in such a way as to impeach her testimony and attack the credibility of the Petitioner's purported statement against interest to Ms. Latham." Accordingly, the post-conviction court determined that the Petitioner failed to establish prejudice.

We likewise conclude that the Petitioner failed to establish that he was prejudiced based on trial counsel's failure to investigate Ms. Latham and Ms. Clabough. The Petitioner failed to offer the testimony of Ms. Clabough or Ms. Latham at the post-conviction hearing. Without their testimony at the evidentiary hearing, the post-conviction court could not determine whether the witnesses would have testified credibly and consistently with their statements to police. Although the Petitioner contends that

their sworn statements could have been introduced as substantive evidence, *see* Tenn. R. Evid. 803(26), we note that the only sworn statement given by Ms. Clabough was the statement in which she described seeing a man fitting the Petitioner's description in a red car outside the victims' apartment the morning of the murders. Thus, it is unlikely that the Petitioner would have sought to admit a statement that seems to inculpate him.

In any event, the record shows that trial counsel cross-examined Ms. Clabough about her prior statements to police, and she admitted that she had given investigators inconsistent stories in the years following the murders. Trial counsel also effectively cross-examined Ms. Latham, using the multiple statements she had given to law enforcement to impeach her testimony and attack the credibility of the Petitioner's purported statement against interest to Ms. Latham. Under trial counsel's cross-examination of Ms. Latham, she agreed that it was only after the police threatened her that she told investigators that the Petitioner admitted to the murders. In short, we cannot conclude that trial counsel's failure to investigate Ms. Latham and Ms. Clabough and present their previous statements to the jury prejudiced the Petitioner.

### 3. Failure to prepare the Petitioner for trial testimony

The Petitioner next contends that trial counsel was ineffective based on trial counsel's failure to properly prepare the Petitioner for his testimony and for cross-examination by the State. He asserts that this failure prevented him from being able to make a knowing decision about the risks and benefits of testifying. Moreover, the Petitioner asserts that because there was no *Momon* hearing conducted before his testimony that there "is no way to ensure that [the Petitioner] fully understood his rights and the consequences of his decision to testify as compared to remaining silent."

The post-conviction court accredited the testimony of trial counsel and co-counsel, who testified that they discussed with the Petitioner whether he would testify both before and during trial, and as part of the discussion, trial counsel and the Petitioner discussed the Petitioner's version of the facts and his extensive criminal history. The post-conviction court also accredited trial counsel's and co-counsel's testimony regarding "the difficulties the facts of this case presented." The post-conviction court found that trial counsel determined that it was a better strategy for the Petitioner to testify in an attempt to rebut the testimony of several witnesses who implicated the Petitioner rather than to remain silent, even if it meant that the Petitioner answered, "I don't know," to multiple questions and led the jury to hear additional evidence regarding the Petitioner's criminal history. The post-conviction court stated, "This court will not second-guess trial counsel's strategy in this regard, nor will it second-guess [trial] counsel's decision to avoid having the Petitioner appear 'too rehearsed' on the witness stand."

The post-conviction court's findings are fully supported by the record. Both trial counsel and co-counsel testified that they discussed with the Petitioner his testifying on multiple occasions. They discussed the Sweetwater party, what witnesses said the Petitioner had done, his criminal history, and the Petitioner's relationship with the women who would testify about inculpatory statements allegedly made by the Petitioner. We agree with the post-conviction court that trial counsel's advice that the Petitioner testify was a matter of trial strategy, which will not be second-guessed by this court. *Granderson*, 197 S.W.3d at 790.

Regarding the Petitioner's assertion that because there was no *Momon* hearing conducted before the Petitioner's testimony there "is no way to ensure that [the Petitioner] fully understood his rights and the consequences of his decision to testify as compared to remaining silent," the State responds that Tennessee Supreme Court Rule 28 and the Post-Conviction Procedure Act require that a petitioner testify at the evidentiary hearing if the petition raises substantial questions of fact as to events in which the petitioner participated. Tenn. Code Ann. § 40-30-110(a); Tenn. Sup. Ct. R. 28, § 8(C)(1)(b); *Keough v. State*, 356 S.W.3d 366, 370 (Tenn. 2011). The State argues that because trial counsel and co-counsel testified that the Petitioner participated in discussions leading up to his decision to testify, if the Petitioner wanted to show that his decision to testify was an unknowing one, he was obliged to testify at the evidentiary hearing. We agree. Because the Petitioner failed to testify that he did not understand his rights and the consequences of his decision to testify, he cannot demonstrate that the evidence preponderates against the post-conviction court's determinations. This issue is without merit.

## 4. Failure to object to irrelevant and prejudicial evidence

The Petitioner further avers that trial counsel rendered ineffective assistance of counsel based on trial counsel's failure to object to testimony regarding the Sweetwater fight and his prior drug dealing. The Petitioner argues that trial counsel should have objected to testimony about the Sweetwater fight because motive is not relevant in a trial for felony murder. Additionally, he argues that trial counsel's strategy to actively discuss the Petitioner's prior drug dealing and federal drug conviction was unsound and based on an "erroneous view of the law."

### a. Fight at the Sweetwater party

In ruling on this issue, the post-conviction court noted that the Petitioner was charged with especially aggravated robbery, and therefore, the State was entitled to present evidence of a potential motive for especially aggravated robbery. Specifically, the State introduced evidence that the Petitioner and OJ Blair were involved in a fight at

the Sweetwater party, which led the Petitioner to go to the victim's residence in an attempt to recover his money. Additionally, the post-conviction court found that, in an attempt to limit the testimony of some witnesses about the Sweetwater fight, trial counsel objected numerous times, and the trial court conducted several Rule 404(b) hearings on the issue.

We agree with the post-conviction court that evidence of the Sweetwater fight was relevant to establish motive for the underlying offense of especially aggravated robbery. This court has previously recognized that evidence of prior bad acts can be admissible to prove a motive for a robbery. *See e.g., State v. Cory Shane Rollins*, No. E2008-01407-CCA-R3-CD, 2010 WL 342653, at *8–9 (Tenn. Crim. App. Feb. 1, 2010), *perm. app. denied* (Tenn. June 17, 2010). The Petitioner has not established deficient performance or prejudice in regards to trial counsel's failure to object to evidence regarding the fight at the Sweetwater party. Accordingly, he is not entitled to relief. *Strickland*, 466 U.S. at 687.

### b. Drug dealing

The post-conviction court found that the Petitioner testified in an attempt to refute the numerous witnesses who testified about the Petitioner's inculpatory statements. The Petitioner's testimony necessarily "meant [that] the [S]tate would be able to impeach the [P]etitioner with proof regarding his federal felony conviction for selling cocaine." The post-conviction court found that trial counsel made the "'strategic decision' to attempt to control the narrative of the Petitioner's past drug dealing, addressing this history directly and presenting evidence that he began selling drugs as a means of supporting his family." The post-conviction court reasoned:

> The strategy put forth by trial counsel—that the Petitioner was a drug dealer, even one who ultimately went to prison because of his actions, but he was not capable of killing someone—was not ideal, but counsel's hand was somewhat forced given the numerous witnesses relating the [P]etitioner's purported inculpatory statements, Ms. Lonas' testimony about the [P]etitioner "fronting" OJ Blair drugs, and the [P]etitioner's choice to testify.

The post-conviction court found that counsels' handling of the issue of the Petitioner's drug dealing "represented their attempts to make the best of a bad situation" and was "within the range of competence demanded of attorneys in criminal cases[.]" Accordingly, the post-conviction court found that trial counsel's performance was not deficient and denied relief.

Upon review, we conclude that the evidence does not preponderate against the post-conviction court's findings. Trial counsel testified that, as part of trial strategy, he decided to have the Petitioner testify and admit that he was a convicted drug dealer. Trial counsel explained that his strategy was to be forthright with the jury regarding the Petitioner's drug dealing while advancing the theory that the Petitioner was "not the type of person who would kill someone." Trial counsel knew that the Petitioner's drug dealing would come to light at trial and made the strategic decision not to hide it. We agree with the post-conviction court that trial counsel's failure to object to evidence of the Petitioner's drug dealing was a matter of trial strategy, which will not be second-guessed by this court. *Granderson*, 197 S.W.3d at 790.

### 5. Failure to question Defendant Blair about her initial statement regarding suspects

The Petitioner additionally contends that he was denied the effective assistance of counsel based on trial counsel's failure to question Defendant Blair about her initial statement to police, in which she alleged that the perpetrators were white men. The Petitioner asserts that, by failing to challenge Defendant Blair's "blanket assertion" of her Fifth Amendment rights, trial counsel "abandoned a fertile ground for exculpatory proof."

The post-conviction court noted that the Petitioner failed to introduce Defendant Blair's purported statement "in any form" at the post-conviction hearing. The post-conviction court found that, by failing to introduce evidence regarding the statement, the Petitioner failed to establish that trial counsel's handling of the statement prejudiced the Petitioner. The post-conviction court reasoned that "[e]ven if trial counsel had successfully argued Defendant Blair was not subject to Fifth Amendment protections, this Court can only speculate as to whether Defendant Blair, had the trial court allowed questioning on the matter, would have offered credible testimony consistent with her earlier statements to police."

We agree with the post-conviction court's conclusions. Because neither Defendant Blair nor the officer to whom she allegedly gave the statement testified at the evidentiary hearing, the Petitioner has not established prejudice. *Black*, 794 S.W.2d at 758. This court can only speculate about this issue. Accordingly, the Petitioner is not entitled to relief based on this claim.

## 6. Failure to adequately protect the Petitioner's appellate rights

### a. Plain error review

The Petitioner asserts that he received ineffective assistance of counsel based on trial counsel's failure to preserve his appellate rights after the State entered the Motion to Nolle in Defendant Younger's case while the Petitioner's direct appeal was pending in this court. Specifically, the Petitioner asserts that he received ineffective assistance of counsel based on trial counsel's failure to raise, as plain error on direct appeal, issues relating to Detective Brumley and Judge Reedy based on the information contained in the State's Motion to Nolle. He contends that the factors for plain error review are met based on the State's assertion of "structural errors" in Defendant Younger's case. The State responds that it was a "practical impossibility" for trial counsel to make a plain error argument and obtain review under the doctrine. The State argues that, because trial counsel was unsuccessful in his Motion to Consider Post-Judgment Facts, the record did not clearly establish what occurred in the trial court as required for relief under plain error. In other words, there was no record of Detective Brumley's conduct before this court on direct appeal.

When a petitioner alleges that counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of that issue. *Carpenter*, 126 S.W.3d at 887 (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)). "Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id.* Further, when an omitted issue is without merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal and cannot prevail on an ineffective assistance of counsel claim. *Id.* at 887-88. Appellate counsel's professional judgment is entitled to considerable deference with regard to which issues best served the petitioner on appeal. *Id.* at 887.

Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at

283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

The post-conviction court determined that the Petitioner failed to establish that he would be entitled to relief under plain error review because the Petitioner had not shown that a clear and unequivocal rule of law was breached or that a substantial right of the defendant was adversely affected. The post-conviction court noted that Judge Blackwood granted the Motion to Nolle against Defendant Younger, "focus[ing] largely on the State's right to dismiss an indictment." Judge Blackwood did not find the facts alleged in the Motion to Nolle were true and specifically stated that his ruling was not to be taken as a ruling on "the propriety of any actions that have been taken in this case[.]" Accordingly, the post-conviction court found that the trial court's order granting the motion "cannot be considered as establishing any law of the case which binds the State in defending [the Petitioner's] current post-conviction action" and that "the [P]etitioner's Brumley-related issues must therefore be judged on the merits as related to [the Petitioner's] case alone."

The post-conviction court found that Detective Brumley's misdeeds, which actually led to his termination, occurred after the Petitioner's trial and would have little, if any, weight regarding Detective Brumley's credibility at the Petitioner's trial. The post-conviction court also determined that there was no evidence that Detective Brumley's actions in other cases affected his credibility to the point that any of the Petitioner's substantial rights were affected in his trial. Additionally, the post-conviction court concluded that the Petitioner's assertion that Detective Brumley coerced witness statements was "largely—if not entirely—unsupported by the record[.]"

Finally, the post-conviction court found that the Petitioner failed to present proof to establish the purported phone calls between Detective Brumley and Judge Reedy. The post-conviction court stated that:

> [n]o evidence establishing these phone calls actually took place was introduced at [the Petitioner's] post-conviction hearing. Statements made in pleadings are not evidence, nor are arguments made at a hearing, and the factual findings at the hearing on the nolle prosequi motions in [Defendant] Younger's case do not include a clear finding these phone calls occurred.

The post-conviction court further reasoned:

> . . . [E]ven if the record of these calls is to be taken as true—again, allegations contained in pleadings are generally not evidence—the record is devoid of any evidence regarding the nature and subject matter of these

phone calls. Because neither Judge Reedy nor Detective Brumley testified at the post-conviction hearing, we have no insight as to the circumstances surrounding the phone calls or the subject matters discussed therein.

Accordingly, the post-conviction court found that no substantial right of the Petitioner was adversely affected at trial and that the Petitioner could not establish plain error.

Upon review, we agree with the post-conviction court that the Petitioner has not established that he is entitled to relief under plain error as the record does not clearly establish what occurred in the trial court. As the State's response notes, the Petitioner's claim raises the question of how trial counsel could have introduced the Motion to Nolle filed in Defendant Younger's case into the appellate record in his case. The appellate record provides the boundaries of an appellate court's review. *State v. Bobadilla*, 181 S.W.3d 641, 643 (Tenn. 2005). An appellate court may consider only evidence contained in the appellate record. *Id.* In this case, trial counsel attempted to present the contents of the Motion to Nolle to this court by filing a Motion to Consider Post-Judgment Facts. This court concluded that the assertions made by the prosecutor in the motion did not constitute post-judgment "facts" capable of consideration by this court under Rule 14 of the Appellate Rules of Procedure and denied trial counsel's motion. *See* Tenn. R. App. P. 14, Advisory Comm'n Cmts (stating that rule permits consideration of only those post-judgment facts "unrelated to the merits and not genuinely disputed" in order to "keep the record up to date" and "is not intended to permit a retrial in the appellate court").

Likewise, it appears that a motion to supplement the appellate record would have been unsuccessful. The procedure for correction or modification of the appellate record is set forth in Tennessee Rule of Appellate Procedure 24(e), which states:

> If any matter properly includable is omitted from the record, is improperly included, or is misstated therein, the record may be corrected or modified to conform to the truth. Any differences regarding whether the record accurately discloses what occurred in the trial court shall be submitted to and settled by the trial court regardless of whether the record has been transmitted to the appellate court. Absent extraordinary circumstances, the determination of the trial court is conclusive. If necessary, the appellate or trial court may direct that a supplemental record be certified and transmitted.

Tenn. R. App. P. 24(e).

However, the authority to supplement the record is limited by Rule 24(g), which provides that:

[n]othing in this rule shall be construed as empowering the parties or any court to add to or subtract from the record except insofar as may be necessary to convey a fair, accurate and complete account of what transpired in the trial court with respect to those issues that are the bases of appeal.

Tenn. R. App. P. 24(g). According to our supreme court,

any matter appropriately considered by the trial court is properly includable in the appellate record and may be added to the record . . . when such matter is "necessary to convey a fair, accurate and complete account of what transpired in the trial court with respect to those issues that are the bases of appeal."

*State v. Housler*, 167 S.W.3d 294, 298 (Tenn. 2005).

Here, the Petitioner filed his notice of appeal in May 2010, and it was not until November 2010 that the State filed the Motion to Nolle in Defendant Younger's case. There is no indication that trial counsel was aware of the information contained in the motion while the Petitioner's case was pending before the trial court. Further, the record contains no suggestion that the trial court knew of, reviewed, or in any way considered the allegations in the Motion to Nolle during the pendency of the Petitioner's case. Because the assertions contained in the Motion to Nolle were not known by the trial court during the pendency of the Petitioner's case in the criminal court, the Motion to Nolle would not be "properly includable" and could not be added to the appellate record under Rule 24(e). *See State v. Rogers*, 188 S.W.3d 593, 611 (Tenn. 2006).

The Petitioner has not explained how trial counsel could have added a matter that was never considered by the trial court or the jury to the appellate record such that it could be considered by this court. Moreover, even if trial counsel could have gotten this court to consider the pleadings in Defendant Younger's case, the allegations contained in those pleadings are not evidence, as noted by the post-conviction court. *Roberts*, 755 S.W.2d at 836. The Petitioner relies on an estoppel argument, asserting that the State cannot deny the existence of the facts in the Motion to Nolle on appeal because the State was the party asserting the structural issues.

In *State v. Scarbrough*, our supreme court stated:

The doctrine of collateral estoppel, which has its origin in civil cases, applies only when "the issue involved in the case under consideration

has already been litigated in a prior suit between the same parties, even though based upon a different cause of action, if the determination of such issue in the former action was necessary to the judgment." *Dickerson v. Godfrey*, 825 S.W.2d 692, 694 (Tenn. 1992) (quoting *Home Ins. Co. v. Leinart*, 698 S.W.2d 335, 336 (Tenn. 1985)).  The party who seeks to bar litigation of an issue by invoking collateral estoppel "has the burden of proving that the issue was, in fact, determined in a prior suit between the same parties and that the issue's determination was necessary to the judgment." *Dickerson*, 825 S.W.2d at 695.

181 S.W.3d 650, 654-55 (Tenn. 2005).  In this case, Judge Blackwood decided that nothing in the interests of justice prevented the State from dismissing the indictment against Defendant Younger, but he did not determine that Detective Brumley and Judge Reedy had engaged in misconduct.  Judge Blackwood was explicit on this point.  Additionally, no evidence was introduced at the hearing on the motion such that the issues were not actually litigated and decided on the merits, and the parties are not the same.  Consequently, the Petitioner cannot satisfy the requirements of collateral estoppel.

### b. Petition for writ of error coram nobis

The Petitioner also contends that he received ineffective assistance of counsel based on trial counsel's failure to file a petition for writ of error coram nobis based on the issues related to Detective Brumley in the Motion to Nolle.  The State responds that trial counsel cannot be held deficient for failing to raise issues relating to Detective Brumley in a writ of error coram nobis petition because there is no constitutional right to coram nobis relief and no right to counsel in such proceedings.  Accordingly, trial counsel's failure to file a coram nobis petition could not amount to a constitutional violation, which is required for post-conviction relief.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999) (internal citation omitted).  Tennessee Code Annotated section 40-26-105(b) provides that coram nobis relief is available in criminal cases as follows:

The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding.  Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to

matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Coram nobis claims are "singularly fact-intensive," are not easily resolved on the face of the petition, and often require a hearing. *Harris v. State*, 102 S.W.3d 587, 593 (Tenn. 2003).

[I]n a coram nobis proceeding, the trial judge must first consider the newly discovered evidence and be 'reasonably well satisfied' with its veracity. If the defendant is 'without fault' in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence *may* have led to a different result.

*State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007). In determining whether the new information may have led to a different result, the question before the court is "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the results of the proceedings might have been different." *Id.*

In limited testimony on this issue, trial counsel stated that he considered the possibility of filing a petition for writ of error coram nobis, but he did not believe that "it was going to be enough to where the [c]ourt was going to say that . . . [the Petitioner] was prejudiced to the extent" required for coram nobis relief. The post-conviction court found that a coram nobis petition would not have been successful and that trial counsel's failure to pursue a coram nobis action did not prejudice the Petitioner. The post-conviction court agreed that the information in the State's motion was "newly discovered," insofar as trial counsel did not learn about the Detective Brumley-related issues until after the Petitioner's trial. However, the post-conviction court found that, had the proposed evidence regarding Detective Brumley's misdeeds in other cases been admissible at Mr. Johnson's trial, it would have served only to impeach his credibility, and impeachment evidence does not entitle a petitioner to coram nobis relief. *See Wlodarz v. State*, 361 S.W.3d 490, 499 (Tenn. 2012) ("[A]s a general rule, newly discovered evidence which is merely cumulative or 'serves no other purpose than to contradict or impeach' does not warrant the issuance of a writ."), *abrogated on other grounds by Frazier v. State*, 495 S.W.3d 246, 248 (Tenn. 2016).

The post-conviction court again noted the lack of proof regarding the issues raised in the Motion to Nolle. Regarding the supposedly coerced statement of Anita Wilson and

the circumstances under which Ms. Wilson's statement was obtained, the post-conviction court determined that:

> the [P]etitioner offered no proof (apart from the allegation in the State's nolle motion in the Younger case—and as stated elsewhere, statements in pleadings are not evidence) regarding the statement. Neither Ms. Wilson, nor Detective Brumley, nor anyone else with knowledge of the Wilson fugitive warrant and statement testified at the post-conviction hearing, the statement and warrant themselves do not appear in the record, and in her jury-out testimony at [the Petitioner's] trial Ms. Wilson did not testify regarding the supposed warrant or her statement implicating [Defendant] Younger. It is entirely possible any issues regarding Ms. Wilson arose after the [P]etitioner's trial, which would make such issues minimally relevant to [the Petitioner's] trial, if such issues were relevant at all. A finding of limited relevance appears particularly appropriate given Ms. Wilson did not testify before the jury at [the Petitioner's] trial.

The post-conviction court found that there was no evidence presented at the post-conviction hearing regarding Detective Brumley's coercing other witness statements. The court noted that Vanessa Latham testified at trial that "the police" had threatened to have her children removed if she did not cooperate, but she also testified that Detective Brumley was not the officer who made the supposed threat. Regarding the issue of the purported phone calls between Detective Brumley and Judge Reedy, the post-conviction court again found that the Petitioner presented "[n]o evidence establishing these phone calls actually took place[.]"

As noted by the State, neither the United States Constitution nor the Tennessee Constitution provides a petitioner with a constitutional right to error coram nobis relief. *Frazier*, 495 S.W.3d at 248 (citing *United States v. Morgan*, 346 U.S. 502, 506 (1954); *State v. Mixon*, 983 S.W.2d 661, 666–68 (Tenn. 1999)). Because there is no constitutional right to coram nobis relief, there is no right to counsel in such proceedings; instead, the appointment of counsel is within the discretion of the trial court. *See Lemar Brooks v. State*, No. M2010-02451-CCA-R3-PC, 2012 WL 112554, at *17-18 (Tenn. Crim. App. Jan. 11, 2012) (citing Tenn. Code Ann. § 40-14-204), *perm. app. denied* (Tenn. May 16, 2012). Therefore, this court has previously recognized that there is no constitutional right to effective assistance of counsel in a coram nobis proceeding. *Melissa Barnett v. State*, No. E2014-02396-CCA-R3-ECN, 2015 WL 5601537, at *4 (Tenn. Crim. App. Sept. 23, 2015), *perm. app. denied* (Tenn. Jan. 21, 2016). This is true even if coram nobis relief is sought while a petitioner's direct appeal is pending because the petition for writ of error coram nobis is a collateral attack on the conviction. *Lemar Brooks,* 2012 WL 112554 at *18. Accordingly, trial counsel cannot be held

constitutionally deficient for failing to raise issues relating to Detective Brumley in a petition for writ of error coram nobis.

In any event, we agree with the post-conviction court that because the Petitioner failed to offer proof of the allegations relating to Detective Brumley, the Petitioner cannot establish prejudice resulting from trial counsel's failure to pursue coram nobis relief. The Petitioner is not entitled to relief based on this claim.

### C. Cumulative Error

The Petitioner contends that the cumulative effect of trial counsel's errors and omissions constituted ineffective assistance of counsel requiring post-conviction relief. The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but have a cumulative effect on the proceedings so great as to require reversal. *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant review under the cumulative error doctrine, however, there must have been more than one actual error during the trial proceedings. *Id.* at 77. In this case, the Petitioner demonstrated a deficiency on the part of trial counsel, *i.e.,* the failure to investigate potential witnesses. However, after reviewing the record and the evidence presented at the evidentiary hearing, we conclude that trial counsel's failure did not prejudice the Petitioner and that the other allegations of ineffectiveness are without merit, as previously explained. Therefore, there are not multiple errors the prejudicial impact of which warrants relief under the cumulative error doctrine. The Petitioner is not entitled to relief on this issue.

### D. Structural Error

The Petitioner asserts that the allegations asserted by the State in the Motion to Nolle establish structural error in the Petitioner's case. Particularly, the Petitioner cites the State's allegations that Detective Brumley coerced statements from witnesses and allegations of inappropriate contact between Detective Brumley and Judge Reedy. The State responds that the Petitioner cannot succeed on the structural error claim because neither Detective Brumley nor Judge Reedy nor any other witness with knowledge of the facts testified at the post-conviction hearing. The State argues that the allegations in the Motion to Nolle are not evidence, and Judge Blackwood's action on that motion furnishes no basis for estoppel.

In *State v. Rodriguez*, our supreme court explained:

> Structural constitutional errors are errors that compromise the integrity of the judicial process itself. *State v. Garrison*, 40 S.W.3d at 433

n. 9. They involve defects in the trial mechanism. *Cottingham v. Cottingham*, 193 S.W.3d 531, 537 (Tenn. 2006). These errors "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no [such] criminal punishment may be regarded as fundamentally fair.'" *Momon v. State*, 18 S.W.3d 152, 165 (Tenn. 1999) (quoting *Neder v. United States*, 527 U.S. 1, 8-9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). Examples of structural constitutional errors include the complete denial of the right to counsel, racial discrimination in the selection of a grand jury, denial of the right of self-representation at trial, and denial of the right to a trial by jury. *Momon v. State*, 18 S.W.3d at 165-66. Structural constitutional errors are not amenable to harmless error review, and therefore, they require automatic reversal when they occur. *Cottingham v. Cottingham*, 193 S.W.3d at 537; *State v. Scott*, 33 S.W.3d 746, 755 n. 6 (Tenn. 2000).

254 S.W.3d 361, 371 (Tenn. 2008).

The post-conviction court addressed the Petitioner's claim of structural error, stating:

> Issues regarding Detective Brumley, including his supposed lack of credibility and allegations he coerced several witness statements, have been reviewed in great detail elsewhere and found not to constitute reversible error. For the reasons stated in those other sections, the Court concludes [those] Brumley-related issues do not constitute structural error. The Court will therefore confine its review of the structural error issue to the [P]etitioner's allegations of inappropriate contact between Detective Brumley and [Judge Reedy].

> In support of the structural error claim relative to this issue, the [P]etitioner cites to the list of telephone calls between phone numbers associated with [Judge Reedy] and [D]etective [Brumley], as well as Brumley's purported comments to the former District Attorney regarding advice a "little birdy" (possibly [Judge Reedy]) had passed along to the detective.

> . . . .

> [I]f [Judge Reedy] acted as the State alleged in the [Motion to Nolle], such actions may be improper under the code of judicial conduct,

- 44 -

and this Court's conclusions should not be seen as an excuse of such potential conduct. However, as stated elsewhere in this order, there is no proof in the record to substantiate the [P]etitioner's assertion the trial judge's potential misconduct affected the integrity of these trial proceedings.

Accordingly, the post-conviction court concluded that the Petitioner's structural error claims were without merit.

Upon review, we agree with the post-conviction court's findings and analysis. The Petitioner has not shown that the Detective Brumley-related issues constitute structural error requiring reversal of his convictions. The Petitioner offered no proof of any telephone calls between Detective Brumley and Judge Reedy. Although the State alleged such conduct in its Motion to Nolle and attached a purported call log as "EXHIBIT 1" to the motion, allegations contained in pleadings are not evidence. *Roberts*, 755 S.W.2d at 836. Likewise, the Petitioner offered no proof about the alleged coercion of witness Anita Wilson, making it "entirely possible any issues regarding Ms. Wilson arose after the [P]etitioner's trial, which would make such issues minimally relevant to [the Petitioner's] trial, if such issues were relevant at all." We also agree with the post-conviction court that, if the proposed evidence regarding Detective Brumley's misdeeds in other cases had been admissible at the Petitioner's trial, it would have served only to impeach the detective's credibility. *See Wlodarz*, 361 S.W.3d at 499. Accordingly, the Petitioner has failed to establish structural error in his trial.

### III. Conclusion

For the aforementioned reasons, the judgment of the criminal court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE